## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| JOHN HUDSON; | ) | |
| ELBERT WRIGHT; AND | ) | |
| ANTHONY DANDRIDGE | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **CASE NO.: 1:20-CV-00582** |
| | ) | |
| LOUISIANA-PACIFIC | ) | |
| CORPORATION; | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiffs John Hudson ("Hudson"), Elbert Wright ("Wright"), and Anthony Dandridge ("Dandridge") (collectively referred to as "Plaintiffs"), by and through the undersigned counsel, hereby allege as their Complaint against Defendant Louisiana-Pacific Corporation ("Louisiana-Pacific" or "LP") as follows:

## JURISDICTION AND VENUE

1.       This is a complaint for legal and equitable relief to redress violations by the Defendant of the Plaintiffs' rights secured by:

      a.       The Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended;

      b.       Title VII of the Civil Rights Act of 1964, (Title VII"), as amended by 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981a;

2.    Federal subject matter jurisdiction exists pursuant to:

a.    28 U.S.C. §§ 1331, 1343(a)(3); and

b.    Title VII, 42 U.S.C. § 2000e-5(f)(3).

3.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e–5(f)(3).

## PARTIES

4.    Plaintiff John Hudson is an African-American, adult male whom Defendant employed in Clarke County, Alabama.  Mr. Hudson is a resident of Grove Hill (Clarke County), Alabama.

5.    Plaintiff Elbert Wright is an African-American, adult male whom Defendant employed in Clarke County, Alabama. Mr. Wright is a resident of Grove Hill (Clarke County), Alabama.

6.    Plaintiff Anthony Dandridge is an African-American, adult male whom Defendant employed in Clarke County, Alabama.  Mr. Dandridge is a resident of Pine Hill (Wilcox County), Alabama.

7.    Defendant Louisiana-Pacific Corporation is a publicly traded corporation headquartered in Nashville, Tennessee. LP is a building-products manufacturer with thousands of employees across myriad locations including several hundred employees at its manufacturing facility in Clarke County, Alabama where LP employed Plaintiffs.

## **NATURE OF THE ACTION**

8.     Plaintiffs bring this action to redress unlawful practices and acts of intentional discrimination which Louisiana-Pacific, as Plaintiffs' employer or former employer, committed.

9.     This lawsuit seeks to redress grievances resulting from actions of Defendant, its agents, servants, and employees with respect to Plaintiffs' employment and otherwise.

## **ADMINISTRATIVE PROCEDURES**

Plaintiff John Hudson Administrative Procedures

10.     On December 2, 2019, within 180 days of learning of the acts of discrimination of which he complains, Plaintiff John Hudson filed a Charge of Discrimination with the Equal Employment Opportunity Commission, ("EEOC"), Charge No. 425-2020-00137, alleging violations of Title VII.

11.     On September 2, 2020, the EEOC mailed a Dismissal and Notice of Rights on Charge No. 425-2020-00137, which was received on September 8, 2020. (*See* Exhibit A).

12.     Because Mr. Hudson filed this action within 90 days of receipt of the EEOC's Notice of Rights letter, this action was timely filed.

Plaintiff Elbert Wright Administrative Procedures

13.    On March 16, 2020, within 180 days of learning of the acts of discrimination of which he complains, Plaintiff Elbert Wright filed a Charge of Discrimination with the EEOC, Charge No. 425-2020-00165, alleging violations of Title VII.

14.    On October 21, 2020, the EEOC mailed a Dismissal and Notice of Rights on Charge No. 425-2020-00165, which was received on October 26, 2020. (*See* Exhibit B).

15.    Because Mr. Wright filed this action within 90 days of receipt of the EEOC's Notice of Rights letter, this action was timely filed.

16.    Plaintiffs Hudson and Wright have satisfied all conditions precedent to bringing this action for the purposes of Title VII.

## STATEMENT OF FACTS

17.    Plaintiffs worked in the general mill area of Defendant's Clarke County facility in Thomasville, Alabama under the same plant manager, safety manager, and human resources manager.

18.    During all times relevant to this action, Jim Motes (Caucasian) served as the Thomasville Plant Manager ultimately charged with overseeing all operations and personnel, including Plaintiffs.

19.    During all times relevant to this action, Drew Scott (Caucasian) served as the Thomasville Assistant Plant Manager and answered only to Motes.

20.    Motes and Scott allowed white supremacists to work at their mill at both the hourly employee and manager level.

21.    Upon information and belief, LP fired Motes following its termination of Plaintiffs' employment as a result of myriad anonymous hotline complaints. These hotline complaints included, among other things, reports that Mr. Motes harbored racial animus towards African-American employees.

22.    Upon information and belief, LP has received similar race-related allegations against Scott, but Scott was not fired.

23.    Under the supervision of Motes and Scott, and at all times relevant to Plaintiffs' claims, African-American employees made up the majority of the lower paying, general laborer positions and were rarely allowed to advance.  Caucasians, for the most part, held the higher paying "skill positions" and were routinely hired directly into those positions with no experience or meaningful qualifications.

24.    During all times relevant to this action, Sundy Phares (Caucasian) served as LP's Human Resources Manager.

25.    Phares ignored multiple complaints from multiple employees about race discrimination towards African-Americans during Plaintiffs' employment.

26.    One of the many race-related complaints Phares ignored involved LP manager Austin Green (Caucasian).

27.    Green told Skyler Chandler (Caucasian and Green's subordinate) in the presence of a maintenance employee (Caucasian) that "black people are demons who are only good as servants and for laughing at." When Mr. Chandler confronted Green about his racial prejudice, Green unapologetically continued with additional hateful, racist language.

28.    Mr. Chandler promptly reported the racism to Ms. Phares, but Phares did nothing.

29.    Further, Ms. Phares did not trust African-American employees, and she was vocal about this distrust. Phares also referred to African-American employees as "you people."

30.    Ms. Phares also went out of her way to ensure African-American employees did not receive the extra pay they earned when serving in a temporary, higher paying position. When Caucasian employees were eligible for extra pay under these exact circumstances, Phares did not interfere and those Caucasian employees were appropriately compensated.

31.    During all times relevant to this action, Daniel Capers (Caucasian) served as LP's Environment Health & Safety Manager.

32.    Capers, working with other managers, targeted certain African-American employees, including Plaintiffs, for termination by accusing them of

safety violations. Capers did not secure termination of certain Caucasian employees who, unlike Plaintiffs, actually violated safety-related policies.

33.     Under the tenure of Motes, Phares, and Capers, among others, and at all times relevant to Plaintiffs' claims, Caucasian employees received better treatment than African-Americans, almost as a matter of policy. For example, and as detailed below, Caucasian employees were allowed to keep their jobs for the exact conduct (and worse) that supposedly warranted termination of African-American employees.

<u>Plaintiff John Hudson (African-American)</u>

34.     LP hired Plaintiff John Hudson in 2013.

35.     Hudson's position was Forklift Operator.

36.     Hudson was qualified for his job, and he did it well.

37.     Shortly into Hudson's morning shift on approximately October 16, 2019, Safety Manager Daniel Capers "snuck up" on Hudson from behind while Hudson was sitting in his forklift.

38.     Hudson had been assisting co-workers and had just returned to the forklift when Capers approached him.

39.     Capers could easily see that Hudson was not sleeping.

40.     Nonetheless, Capers intentionally startled Hudson and then made Hudson's surprised response the basis of a false accusation that Hudson was

sleeping on the job. Hudson respectfully corrected Capers who then handed Hudson an electrolyte popsicle and left.

41.    Sandra Irvin and Larry Williams (both African-American employees) witnessed these events.

42.    Hudson considered the encounter with Capers a non-incident and was surprised when he was called into Phares' office in LP's human resources department.

43.    Phares had Capers present in her office when she told Hudson he was fired, effective immediately, for sleeping on the job.  Hudson respectfully informed Phares that he was not sleeping on the job.   But Phares was not interested in Hudson's explanation.

44.    Phares did not investigate Caper's allegations or speak with the African-American employees who actually witnessed the events unfold as Hudson described.

45.    Shortly after his termination, Hudson was approached by his former supervisor who apologized to Hudson.

46.    Hudson learned that Capers had recently caught forklift operator Brian Jackson (Caucasian) sleeping on the job.  Jackson had drool dripping from his mouth as he slept. Capers woke Jackson, and the two white men laughed about the incident.  LP did not fire Jackson for sleeping on the job.

47.     Further, Steven Johnson (Caucasian) fell asleep on the job, which resulted in a fire and property damage. Johnson admitted he fell asleep and, upon information and belief, LP has this admission in a written statement.  LP did not fire Johnson for sleeping on the job.

48.     On Hudson's termination form, Phares (upon information and belief) wrote as follows: "Sleeping on the job is not acceptable."

49.     Upon information and belief, Motes and Scott were aware of, and approved of, this more favorable treatment towards Caucasian employees.

Plaintiff Elbert Wright (African-American)

50.     LP hired Plaintiff Elbert Wright in 2013.

51.     Wright's position was Forklift Operator.

52.     Wright was qualified for his job, and he did it well.

53.     On approximately October 16, 2019, Wright saw Capers approaching his work area as Wright cleared scrap and re-entered his forklift.  Wright watched Capers maneuver himself all around the plant so that Capers could approach Wright from behind.

54.     Capers positioned himself about three feet behind Wright and yelled, "Wake Up!"  Wright turned his head and respectfully informed Capers that he was not asleep.  Capers offered Wright an electrolyte popsicle and left.

55.    But Capers soon returned and told Wright to come with him to Phares' office where Wright found several random Caucasian managers waiting for him.

56.    Phares informed Wright that his employment was terminated for sleeping on the job and stated that he had been observed sleeping for about 10 minutes straight.

57.    Wright vehemently denied this, but Phares responded: "regardless of what happened, I have to go with what my safety manager [Capers] said."

58.    Phares, who did not trust African-American employees, did no independent investigation to confirm Caper's allegations. The single employee who provided a written recount of the events did not support Caper's story. To that end, the employee's statement reads: "I don't know if [Wright] was asleep or not . . . ."

59.    Based on Wright's discharge form, sleeping on the job alone was grounds for termination because this conduct supposedly put everyone at risk of injury. But this rule did not apply to Caucasian employees like Brian Jackson and Steven Johnson.

60.    Capers had recently caught forklift operator Brian Jackson (Caucasian) sleeping on the job. Jackson had drool dripping from his mouth as he

slept. Capers woke Jackson, and the two white men laughed about the incident.  LP did not fire Jackson for sleeping on the job.

61.     Further, Steven Johnson (Caucasian) fell asleep on the job, which led to a fire and property damage. Johnson admitted that he fell asleep and, upon information and belief, LP has this admission in a written statement.  LP did not fire Johnson for sleeping on the job.

62. Upon information and belief, Motes and Scott were aware of, and approved of, this more favorable treatment towards Caucasian employees.

Plaintiff Anthony Dandridge (African-American)

63.     LP hired Plaintiff Anthony Dandridge in approximately 2012.

64.     Dandridge's position was Load Operator.

65.     Dandridge was qualified for his job, and he did it well.

66.     Despite having no history of discipline or performance issues, LP fired Dandridge in December 2019 after a trivial offense.

67.     To that end, Dandridge neglected to report that he bumped a guard rail while operating a machine resulting in, at the very most, minor and superficial damage he deemed unworthy of LP's time or attention.

68.     Dandridge did not report the incident because he did not consider it an incident as it did not damage the machine.

69.    According to supervisors, including Assistant Plant Manager Drew Scott (Caucasian), Dandridge's minor omission constituted a "failure to report" under LP Policy.

70.    That same policy, however, called for progressive discipline under circumstances like those present in Dandridge's situation.  Specifically, Dandridge had been with LP (a high turnover company) for many years with no negative performance history and the incident at issue was insignificant.

71.    In violation of its own policies, LP bypassed progressive discipline, warnings, and even suspensions. Instead, in late December 2019, LP fired Dandridge citing "failure to report."

72.    Upon information and belief, Phares and Capers were involved in the decision to fire Dandridge. But it was Scott who informed Dandridge that he was fired.

73.    Similarly situated Caucasian employees committed far worse policy violations, including "failure to report," and were not terminated. As just one example, Load Operator Kyle Dunicken (Caucasian) failed to report significant damage and was not fired.

74.    LP contested Dandridge's unemployment arguing he was fired for good cause, and it lost.

75.    Upon information and belief, Motes and Scott were aware of, and approved of, this more favorable treatment towards Caucasian employees.

## CAUSES OF ACTION

### Count I
### Plaintiffs John Hudson and Elbert Wright
### Against Louisiana-Pacific Corporation
### (Race Discrimination in Violation of Title VII)

76.    Plaintiffs Hudson and Wright reallege and incorporate by reference the allegations set forth in paragraphs 4-5, 7, and 10-62 above as if fully repeated and set forth herein.

77.    Plaintiffs Hudson and Wright (both African-American) are members of a protected class.

78.    Plaintiffs Hudson and Wright were at all times qualified to perform their duties while employed by Defendant.

79.    As detailed above, Plaintiffs Hudson and Wright allege that the following Caucasian LP Managers (among others) harbored racial animus towards African-American employees: Plant Manager Jim Motes, Assistant Plant Manager Drew Scott, Human Resources Manager Sundy Phares, and Environment Health & Safety Manager Daniel Capers. Plaintiffs further allege that these managers approved of, facilitated, and/or knowingly allowed Caucasian employees to receive better treatment than African-American employees because of their race.

80.     As detailed above, Plaintiffs Hudson and Wright allege that Defendant allowed white supremacists to work at its mill at both the hourly employee and manager level.

81.     Defendant treated similarly situated employees who are outside Plaintiffs' protected class more favorably.  This is evidenced by, among other things, the fact that African-American Forklift Operators Hudson and Wright were fired under the pretext of "sleeping on the job," but Caucasian Forklift Operators Brian Jackson and Steven Johnson were caught actually sleeping on the job and were not fired for it.

82.     Defendant, by and through Phares, Capers, Scott, and/or Motes (among others) subjected Plaintiffs Hudson and Wright to an adverse employment action by terminating their employment.

83.     Defendant fired Plaintiffs Hudson and Wright because of their race and would not have fired these Plaintiffs but for the fact that they are African-American.  *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739, 207 L. Ed. 2d 218 (2020) (explaining "but for" causation and that an event may have many "but-for causes")

84.     Defendant's decision to fire both Hudson and Wright was motivated by their race.  *See* 42 U.S.C. § 2000e-2(m); *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) (addressing mixed-motive claims under Title VII).

85.    Defendant has an established Human Resources department that trains its managers and supervisors on the requirements of federal laws dealing with employment discrimination. Defendant's agents knew or should have known that their actions against Plaintiffs Hudson and Wright were in violation of Title VII and they acted in reckless disregard of these Plaintiffs' rights under that statute.

86.    As a proximate result of Defendant's unlawful discrimination, Plaintiffs Hudson and Wright have suffered financial and economic loss, loss of employment, shame, humiliation, emotional and physical injury, distress, and physical and emotional trauma.

87.    Plaintiffs Hudson and Wright seek declaratory and injunctive relief, an award of back pay, reinstatement (or front pay in the event reinstatement is deemed inappropriate), compensation for loss of benefits and other make-whole relief, pre- and post-judgment interest, compensation for loss of career opportunities, compensatory and punitive damages for mental anguish and physical injury, attorneys' fees, costs, expenses, and any and all such other relief deemed appropriate.

## Count II
## All Plaintiffs
## Against Louisiana-Pacific Corporation
## (Race Discrimination in Violation of 42 U.S.C. § 1981)

88.     All Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 4-5, 7, and 10-75 above as if fully repeated and set forth herein.

89.     In addition, Plaintiffs Hudson and Wright allege as if set forth herein their allegations in Count I of this Complaint.

90.     This is a claim against Defendant for the intentional and illegal discrimination against Plaintiffs because of their race. Defendant denied Plaintiffs the same rights under their contract of employment as it affords Caucasian citizens, due to their race (African-American).

91.     LP employed Plaintiff Anthony Dandridge.

92.     Plaintiff Dandridge is a member of a protected class.

93.     Dandridge was at all times qualified to perform his duties while employed by Defendant.

94.     As detailed above, Dandridge alleges that the following Caucasian LP Managers (among others) harbored racial animus towards African-American employees: Plant Manager Jim Motes, Assistant Plant Manager Drew Scott, Human Resources Manager Sundy Phares, and Environment Health & Safety Manager Daniel Capers. Plaintiff further allege that these managers approved of,

facilitated, and/or knowingly allowed Caucasian employees to receive better treatment than African-American employees because of their race.

95.     As detailed above, Dandridge alleges that Defendant allowed white supremacists to work at its mill at both the hourly employee and manager level.

96.     Defendant treated similarly situated employees who are outside Dandridge's protected class more favorably. This is evidenced by, among other things, the fact that African-American Load Operator Dandridge was fired under the pretext of "failure to report" a minor incident despite having no disciplinary history in violation of LP's progressive discipline policy but Caucasian Load Operator Kyle Dunicken was not fired after he failed to report a serious event that resulted in actual damage to LP property.

97.     Defendant, by and through Phares, Capers, Scott, and/or Motes (among others) subjected Dandridge to an adverse employment action by terminating his employment.

98.     Defendant fired Dandridge because of his race and would not have fired Dandridge but for the fact that he is African-American. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739, 207 L. Ed. 2d 218 (2020) (explaining "but for" causation and that an event may have many "but-for causes")

99.     Defendant has an established Human Resources department that trains its managers and supervisors on the requirements of federal laws dealing with

employment discrimination. Defendant's agents knew or should have known that their actions against Dandridge were in violation of Section 1981 and they acted in reckless disregard of Plaintiff's rights under that statute.

100. As a proximate result of Defendant's unlawful discrimination, Dandridge has suffered financial and economic loss, loss of employment, shame, humiliation, emotional and physical injury, distress, and physical and emotional trauma.

101. All Plaintiffs seek declaratory and injunctive relief, an award of back pay, reinstatement (or front pay in the event reinstatement is deemed inappropriate), compensation for loss of benefits and other make-whole relief, pre- and post-judgment interest, compensation for loss of career opportunities, compensatory and punitive damages for mental anguish and physical injury, attorneys' fees, costs, expenses, and any and all such other relief deemed appropriate.

WHEREFORE, Plaintiffs respectfully request that this Court grant the relief sought through each of the above-stated Counts.

PLAINTIFFS DEMAND TRIAL BY STRUCK JURY

Respectfully submitted,

_____
Brian O. Noble ASB-9735-R39N
Joey A. Chbeir ASB-1829-Y54C
Attorneys for Plaintiffs


OF COUNSEL:

CAPSTONE LAW, LLC
3105 Sunview Drive 43888
Vestavia, Alabama 35243
Phone: (205) 578-1210
Fax: (205) 484-9974
E-mail:  brian.noble@caplawllc.com
         joey.chbeir@caplawllc.com