IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JOHN HUDSON, et al,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | CIVIL ACTION NO. 1:20-00582-JB-C |
| **LOUISIANA-PACIFIC CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## ORDER

This matter is before the Court on Defendant Louisiana-Pacific Corporation's Motion for Summary Judgment. (Doc. 41). The parties have briefed the Motion and filed evidentiary material. (Docs. 42, 43, 45, 46, 47 and 51). The Motion is ripe for resolution. For the reasons set out below, the Court concludes the Motion is due to be granted in part and denied in part.[1]

**I.   BACKGROUND**

Plaintiffs John Hudson, Elbert Wright, and Anthony Dandridge are former African American employees of Defendant Louisiana-Pacific Corporation. (Plaintiffs' Statement of Material Facts (Doc. 45)). Plaintiffs worked at Defendant's facility in Clarke County, Alabama. Each Plaintiff was terminated at different times, for different incidents, in 2019. (*Id.*). Hudson and Wright were terminated in September and October of 2019, respectively, after having been reported for sleeping on their forklifts. Hudson and Wright deny they were sleeping. Dandridge

---

[1] The Court has considered Plaintiffs' Motion to Strike the Declaration of Jocelyn Gipson-Vincent and Defendant's opposition thereto. (Docs. 48 and 50). Plaintiff's Motion to Strike is not well taken and is denied for the reasons set out in Defendant's opposition.

was terminated in December 2019 after he struck a guardrail with a loader and failed to report it. Dandridge concedes this, but contends he did not report it because no damage was caused to his loader.

Defendant argues its decisions to terminate Plaintiffs were legitimate business decisions which had nothing to do with race. (Doc. 43). Plaintiffs claim Defendant terminated them based on race. (Doc. 1). Hudson and Wright assert causes of action under Title VII and Section 1981. Dandridge has only a Section 1981 claim. (*Id.*).

Defendant argues Plaintiffs' claim fail as a matter of law because, under the *McDonnell Douglas* burden-shifting analysis applicable to claims based on circumstantial evidence, Plaintiffs cannot establish a *prima facie* case a race discrimination or that Defendant's stated reasons for termination were pretextual.[2] (Doc. 43). Defendant also argues Plaintiffs cannot present a "convincing mosaic" of circumstantial evidence to support an inference of race discrimination. (*Id.*). Finally, for purposes of Plaintiffs' Section 1981 claims, Defendant contends the record cannot support an inference that race discrimination was a but-for cause of the terminations. (*Id.*).

Plaintiffs do not attempt to establish a *prima facie* claim under *McDonnell Douglas*. Rather, Hudson and Wright argue their case is a "mixed-motive" case not subject to *McDonnell Douglas*, and they have presented sufficient evidence to allow a jury to infer race was "a motivating factor" in their terminations. (Doc. 45). Additionally, all Plaintiffs argue they have presented a "convincing mosaic" of circumstantial evidence to allow an inference of intentional discrimination. (*Id.*).

---

[2] It is undisputed Plaintiffs rely on circumstantial evidence. (*See* Plaintiffs' opposition, Doc. 45 at PageID#751).

A.      **Plaintiffs' Evidence:**

Plaintiffs offer the following evidence in opposition to Defendant's Motion for Summary Judgment.  (*See* Doc. 45 and record citations therein).  Defendant employed Jim Motes from 2013 until October of 2020 at its plant in Clarke County, Alabama. In 2018, Motes became Plant Manager.

In 2017 or 2018, Defendant conducted a plant meeting to emphasize the importance of not sleeping on the job.  Sleeping on the job was supposed to be an offence subject to immediate termination, without prior corrective action.  Likewise, failure to report a serious safety issue was grounds for immediate termination without prior corrective action. Motes recognized that application of these policies according to an employee's race would constitute discrimination.

Before his employment with Defendant in 2013, Motes worked at his family business, Technical Engineering and Construction Services ("TEC").  Motes worked with Ozie Robinson, an African American, at TEC and had no reason to suspect he was dishonest.  Robinson worked with Motes at TEC for 10 years, until 2013, when Motes left for employment with Defendant. Robinson has never been employed by Defendant, though he has visited Defendant's plant as a contractor and saw Motes there.  Robinson provided a sworn declaration in which he states, sometime within the "last few years," he saw "some form of the N-word" in a bathroom at Defendant's plant.  Robinson believes Motes and his family are racists.  A relative of Motes told Robinson that Motes' father "was high up like a grand wizard in the Klan," and that the "Motes' family" attended Klan rallies.  Robinson heard Motes say "Nigger" and "other hateful terms about black people" many times, but does not state when he heard these statements.  He recalls hearing Motes say whites should be paid more than blacks and were superior, but does not state

3

when he heard these statement.  He heard Motes say he "just didn't think they were equal to white people," but does not state when he heard this.  Robinson does not believe Motes had "a problem with black people working."  Sometime during Robinson's employment with TEC, a white employee kept a noose in a work trailer.  Robinson does not state when.  Robinson believes Motes saw it, but Robinson did not say anything to Motes about it.  Nothing was done.  Sometime in 2012 - 2013, while Motes was employed with TEC, Robinson saw a confederate flag in Motes' vehicle and states Motes had a racist political bumper sticker.  Robinson does not know if Motes had the bumper sticker after 2013.  Robinson "heard [] Motes was in the Klan along with a lot of his family, and that [] Motes was helping get rid of black people at Defendant to hire white people into those higher paying spots."  Robinson does not state when he heard these statement, or who made them.  He states, "I heard it got really bad during the Donald Trump time. It's a small area we live in and everybody talks, so you hear this stuff." [3]

Plaintiffs offer as evidence of race affecting Motes' personnel decisions that Motes hired African American employees because they were African American.

Plaintiffs also provide a statement in an EEOC charge of former Defendant employee Skyler Chandler.  Chandler, who is white, claims he was unlawfully discharged by Defendant in July 2020.  He had worked under the supervision of Defendant's employee Austin Green, who was subordinate to superintendent Drew Scott and Motes.  Chandler recalls Phares was the Human Resources Manager.  Chandler's statement notes his belief that Defendant discharged Motes (and "perhaps" Scott) "purportedly" for anonymous complaints which he "believes"

---

[3] In a footnote, Defendant objects to Robinson's declaration on grounds of relevance, that it is "highly prejudicial," hearsay, and improper character evidence. The Court overrules that objection.

involved racism. Chandler "learned" that former Defendant supervisor Kelvin Lewis alleges Phares referred to African Americans as "you people," and told an unnamed African American supervisor that she did not trust "you people." Chandler also "learned" that, according to Lewis, Phares routinely downgraded the pay of African American employees for no reason, but did not do so for white employees. Chandler heard Green say to "Stevie" (a maintenance employee), in June 2019, that "blacks are demons," "only good as servants," and "good for laughing at." Green told Chandler he invited black employees to his home to watch them get drunk and laugh at them. Around June 2019, Chandler reported to Phares "that there was race discrimination occurring in the plant," but Phares was uninterested. Chandler informed Phares that Green fired Brian Williams, an African American employee Chandler believed to be a "great worker," and replaced him with "an unqualified white kid barely out of high school." Chandler does not identify the white replacement. Chandler believes Green's reason for firing Williams was pretextual. Chandler believes Green similarly terminated another African American employee named "Charles," and replaced "him with a white kid, again barely out of high school." Chandler does not identify "Charles" or his replacement. Chandler states racial discrimination was pervasive at Defendant's plant, and was reflected in racist hiring and disciplinary practices. Chandler believes "whites received way better treatment than African-Americans. But Phares did not appear to care about racism at LPC."

Kelvin Lewis, an African American former supervisor, believed he was a "token black" manager, and was excluded from team meetings attended by Caucasian managers. Lewis states Green acted in a racist way toward him, and described Green's racist actions as follows:

> Me and him, we shared an office together. It started out as small things. I'd come in my office, I would see stuff missing on my desk. My computer, I would come in,

5

> everything would be disconnected. I would come in, things would be glued down to my desk. I would come in my office, my work boots would have water in them. Then, I think, the worst thing that happened was I came in my office one day, there was purple Kool-Aid in my hard hat . . . . I would come in, the mouse would be glued down, keyboard, mouse pad, trash would be on my desk . . . .trash would be literally on my desk. . . . they say black people like watermelon, chicken . . . [a]nd purple Kool-Aid . . . it's very offensive.

(Doc. 45; Lewis Dep. 63:19-68:21). Lewis believes Motes knew about "some of the racial issues like this" but did nothing. (*Id.* at 49:13-50:9). Phares, according to Lewis, did nothing in response to multiple complaints about racism. Phares told Lewis to keep quiet about the matter.

Motes ultimately fired Lewis for the stated reason of violating a policy on which he was untrained. Lewis states Green violated the same policy and was not terminated.

Plaintiffs note that Motes was not surprised to hear Phares "did nothing constructive with race-related complaints," and that he believed Phares to be "either half honest or totally dishonest."

Kelvin Lewis observed Capers, early in 2020, catch a white employee, Johnathon Lewis, sleeping but he suffered no consequence. Lewis does not state where Johnathon Lewis was sleeping.

Capers was observed catching Brian Jackson, a Caucasian, asleep on his forklift, sometime in 2019, without consequence.[4] Motes agreed that if in fact Brian Jackson was caught sleeping on the forklift and nothing happened to him, it amounted to evidence of race discrimination. When asked whether he thought Capers was dishonest, Motes testified "there were a couple of

---

[4] Plaintiffs offer the declaration of Levor Weatherly, a current African American employee of Defendant. However, as Plaintiffs concede, Mr. Weatherly "refused to sign the declaration." Plaintiffs represent Mr. Weatherly's refusal is based on fear, and note Hudson testified Mr. Weatherly agreed with the content. Defendants contend the unsigned declaration is due to be struck and disregarded as such. (Doc. 51). The Court agrees and will not consider Mr. Weatherly's declaration.

specific incidents that made me question whether or not he was being honest with us about where he was." Motes Dep. 225:10-20. [5]

Motes fired Hudson for "sleeping on the job . . . no more, no less."

Green failed to report a workplace injury and was not terminated.  Motes' disputes Green's failure to report.

Kyle Dunnigan, a Caucasian employee who held the same position as Dandridge during Motes' tenure, "busted [a] windshield and a skid steer," and there was no record of discipline in his file.  Scott claimed Dunnigan received some form of discipline short of termination, but Scott could not explain the absence of a record that "should be" there.

Stephen Johnston, a Caucasian dryer operator during Motes' tenure, fell asleep (supposedly during a five-minute break) and a "pretty severe" fire resulted. Johnston was not fired. Scott testified the consequences for sleeping on the job, when discussing Johnston (and in general), that at some points it warranted "immediate termination" while, at the same time, testifying: "[y]ou've got to take into consideration certain accounts." (Doc. 45; Scott Dep. 37:16-38:49:8).

---

[5] Motes' *complete* testimony is:

Q. Thank you. Tell me about Mr. Capers. Do you have any reason to think he's an honest or dishonest person?
A. We -- we had some issues with his attendance. I mean, there were -- there were a couple of specific incidents that made me question whether or not he was being honest with us about where he was. Other than that, no, no, no specific of a time when he was, you know, lying about something that happened at the plant that I know of.

**B.     Defendant's Reply:**

In its initial brief and in reply to Plaintiffs' evidence, Defendant notes undisputed facts remain that, it contends, nevertheless entitle it to judgment as a matter of law. (*See* Docs 43 and 51 and record citations therein).  The Court finds the following facts remain undisputed.

Motes was employed by Defendant in 2013.  Motes became Defendant's Plant Superintendent in 2014, and then Plant Manager in 2018.  Drew Scott was subordinate to Motes, having succeeded him as Plant Superintendent in 2018.  Also in 2018, Daniel Capers became Environmental Health and Safety Manager.  Capers conducted regular safety meetings and regularly observed operations for safety issues.  Sundy Phares became Human Resources Generalist in 2019.

There were layers of supervisors between Plant Manager Motes and Plaintiffs.  (*Id.*). Plaintiffs had different immediate supervisors.

Defendant conducted safety meetings in which employees were informed sleeping on the job was a terminable offense.  Defendant's General Conduct and Job Performance policy prohibits sleeping on the job.  Beginning in 2017 or 2018, Defendant conducted meetings to inform employees that sleeping on the job was a terminable offence.  This policy was put in place by Motes' predecessor Plant Manager.  Defendant's policies also required employees to report incidents, regardless of severity, to their supervisors.  Employees are required to assist in corresponding incident investigations and provide details upon request.

Wright started working for Defendant in 2013.  He received safety violations in 2013, attendance notices in 2014, 2015, and 2016, and a poor performance writeup in 2017.  Wright had no complaints about his treatment at the Plant prior to his termination in 2019.

Wright was terminated in October 2019, after Capers reported he found Wright sleeping on his forklift. Capers was handing out popsicles (which he did pretty often to help hydrate employees when it was hot) and came up to Wright's forklift. Capers told Wright to wake up, and Wright denied he was asleep. Capers took Wright to meet with David Belcher (Area Supervisor), Phares, and Brandon Miller, a new supervisor.

Motes made the decision to terminate Wright following the report of Wright's having been asleep on his forklift. After Wright's termination, Defendant hired Maurice Bettis, an African American, as a Forklift Operator.

Wright agrees that if he had been sleeping Defendant was justified in terminating him, and that sleeping on the job is unacceptable and could cause a dangerous situation. Wright recalls Motes speaking to everyone about sleeping on the job the month before his termination.

Wright never had prior dealings with Motes. He never felt Motes discriminated against him. Wright does not think that any of Defendant's employees discriminated against him, other than Capers. Caper's report of Wright's sleeping on his forklift is the only action ever taken by Caper that Wright disliked. Capers had never given Wright a reason to think he was picking on him or did not like him. Wright also never saw Capers being mean or picking on anyone else.

Motes knows of no time that Capers lied about something that happened at the plant, and believes Capers is direct. Motes never heard Capers use a racially derogatory term at work. Motes thought Capers was a "very forward person" and Motes "[didn't] think he would have

9

treated people inconsistently." Motes is not aware of any time when Capers found someone asleep and they were not terminated.[6]

Defendant hired Hudson in 2013. Defendant promoted Hudson to Forklift Operator on January 1, 2017. Hudson and Wright worked on different shifts.

Hudson received Employee Notification/Corrective Action Reports in 2013 for a quality issue, for property damage in 2013, for teamwork and poor job performance issues in 2015 and 2017, for attendance in 2018, and for property damage in 2019.

In September 2019, Capers was handing out electrolyte popsicles to employees and walked up to Hudson while he was on the forklift. Capers reports he found Hudson sleeping and raised his voice to wake him up. Hudson replied "Man, you scared me." Hudson denies he was asleep. James Bryson was at the forklift when Hudson and Capers were talking. Capers reported this to Phares, Belcher and James Gates, Shift Supervisor, and that Bryson was with him at the time. Capers and Bryson sent emails to Gates, Belcher, and Joe Gage, OSB Supervisor, with a copy to Motes, reporting they're having found asleep on his forklift. Motes made the decision to terminate Hudson.

Defendant replaced Hudson on the forklift with Sandra Ervin, an African American. Defendant also hired Tyrece Martin, an African American, as a forklift operator following Hudson's termination.

Hudson knew Motes since 2013. Hudson never heard Motes use a racial epithet, never heard him say anything to suggest that African Americans are less than white people, and never

---

[6] The EEOC received a charge from Wright on March 16, 2020, alleging Defendant discriminated against him based on his race. (Doc. 1-2).

10

heard from anyone that Motes said these kinds of things. Hudson testified that Motes never before acted in a racially discriminatory manner towards him.[7]

Dandridge was employed by Defendant as an Operator - Strander Aide in January 2013. At the time of his termination in December 2019, Dandridge was a Strander Aide-Load Operator. Dandridge received a Corrective Action Report in 2014 for a safety issue.

On a night shift, Dandridge was operating a wheel loader and "bumped" a guardrail with the buggy of his loader. The impact "bent the guardrail just a little bit" but there was "no damage to the wheel loader." No one witnessed the incident.

Dandridge knew that LP had a policy that any work-related incident had to be reported to his supervisor and understood what was expected of him in terms of this requirement. Dandridge testified he did not report the incident because he did not think there was any damage to the wheel loader. Defendant discovered the guardrail was visibly destroyed. As no one admitted to having caused the accident, Defendant viewed video of the incident. The video revealed Dandridge caused the incident.

Motes reviewed the video of Dandridge's incident and the post-incident destroyed guardrail. Motes made the decision to terminate Dandridge. Motes testified that Dandridge would not have lost his job if he would have come forward and reported he had an accident. Scott and Gates met with Dandridge, and Scott told him he was terminated because he failed to report the incident.

---

[7] Hudson signed an EEOC Charge on December 2, 2019 alleging Defendant discriminated against him based on his race. (Doc 1-1).

11

The damage Dandridge caused to the guardrail was significant and was a safety issue. Defendant conducted an integrity check of the structure, as Dandridge hit protective guardrails around a main support beam for the conveyors that kept the mill together. Defendant replaced the guardrail around the conveyor as it was destroyed.

Defendant replaced Dandridge with Levor Weatherly, an African American, and hired Eddy Stopp, an African American, as a Strander-Aide. Dandridge testified that no one at Defendant's facility used racial terms with him.

Dandridge was not being honest when he did not admit to the incident, and when Gates asked him about it. However, Dandridge believes Defendant should have given him a write up or a three-day layoff instead of terminating him.

## II.     ANALYSIS

### A.     Jurisdiction and the Summary Judgment Standard:

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. There is no dispute regarding personal jurisdiction or venue.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving

party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

"To the extent that evidence conflicts at summary judgment, the district court has an obligation to view all the evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Allen v. Board of Public Education*, 495 F.3d 1306, 1315 (11th Cir. 2007) (internal quotes omitted).

### B. Plaintiffs' Claims:

Hudson and Wright assert claims for race discrimination under Title VII and Section 1981. (Doc. 1). Dandridge's claim for race discrimination is asserted under Section 1981. (*Id.*). Claims brought under Title VII and Section 1981 both "require proof of discriminatory intent, and each claim is analyzed in the same manner." *Gosa v. Wal-Mart Stores E., LP*, 2017 U.S. Dist. LEXIS 14900, *19 (S.D. Ala. 2017) (citing *Bolton v. Baldwin Cnty. Publ. Schs.*, 47 F. Supp. 3d 1342, 1349 (S.D. Ala. 2014)).

In their opposition to summary judgment, Plaintiffs do not even attempt a response to Defendant's argument that their claims fail under the *McDonnell-Douglas* burden shifting framework. (Doc. 45). Rather, all three Plaintiffs argue they have presented a "convincing mosaic" of circumstantial evidence of intentional discrimination, such that they need not satisfy *McDonnell-Douglas*. (*Id.*). Hudson and Wright further argue their Title VII claims are not subject to *McDonnell-Douglas* because they have asserted a "mixed-motive" case. (*Id.*). They argue the record includes sufficient evidence for a jury to infer that race was a motivating factor in their terminations.

13

### 1. "Convincing Mosaic"

Plaintiffs correctly argue the *McDonnell-Douglas* framework is not the only method by which to overcome a summary judgment motion in a discrimination case. A plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). In *Lewis v. City of Union City*, the Eleventh Circuit stated, "a 'plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). A "'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185.

"The evidence presented under the 'convincing mosaic' must be sufficient enough 'to overcome the lack of comparator evidence.'" *Williams v. Cleaver-Brooks, Inc.*, 2012 U.S. Dist. LEXIS 174818 (M.D. Ga. Dec. 11, 2012). Furthermore, Plaintiffs have the "burden to connect the mosaic tiles; the court need not attempt to piece together a mosaic when she has not done so." *Bradford v. Regions Fin. Corp.*, 2015 U.S. Dist. LEXIS 6005, at *26 (N.D. Ala. Jan. 20, 2015); *see also Killingsworth v. Birmingham-Jefferson Cty. Transit Auth.*, 2019 U.S. Dist. LEXIS 139800, at *29 - 30 (N.D. Ala. Aug. 19, 2019) ("[t]o the extent [the plaintiff] relies on a mosaic of discrimination theory, he must present the tiles and create the mosaic instead of expecting the court to piece it together for him.").

Plaintiffs have failed to present a "convincing mosaic" of evidence to support an inference of Motes' intentional discriminatory intent. The Court finds Defendant's Reply to Plaintiffs' argument in this regard (Doc. 51, PageID#1206 - 1208) to be well taken and adopts the analysis therein. Plaintiffs fail to articulate how their evidence bears "suspicious" timing in relation to their terminations from which an inference of Motes' discriminatory intent might be drawn. Plaintiffs' evidence of Motes' racial animus is substantially separated by time from Plaintiffs' terminations. Furthermore, there is no evidence that Motes was aware of any discriminatory treatment by any employee occurring in suspicious proximity to his decisions to terminate Plaintiffs. Each of the Plaintiffs were employed by Defendant in 2013, some six years prior to their terminations. Neither Hudson nor Wright have evidence of Motes discriminating against them during their six-year tenure prior to being terminated. After their terminations, Plaintiffs were replaced with African Americans.

Plaintiffs' evidence also fails to demonstrate Defendant systematically treated similarly situated employees better than African American employee. It is undisputed that Defendant terminated white and African American employees, in addition to Plaintiffs, for sleeping on the job. (Doc. 43). Defendant also failed to terminate white and African American employees for sleeping on the job. (*Id.*). This may constitute an inconsistent application of policy, but it does not constitute evidence of systematic unequal treatment of similarly situated employees. As for Plaintiff Dandridge, the record is devoid of any "similarly situated employees" for Defendant to have treated systematically different. The record is clear that Dandridge struck and damaged a guardrail, that he was required to report it, that he did not, and that he failed to disclose it when asked. Other employees mentioned by Plaintiffs reported incidents in

which they were involved. (*Id.*). African American employees who reported their incidents were not terminated. (Docs. 42-2 and 42-6). Plaintiffs point to failure by Green to report an injury, but the injury was to another person and there is no evidence he concealed it, as Dandridge concealed the accident that he caused.

Finally, Plaintiffs have failed to establish Defendant's reasons for terminating them were pretextual. Hudson and Wright deny they were sleeping on their forklifts, but denials are not sufficient to establish pretext. The law requires more. Hudson and Wright must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" Defendant's reason "that a reasonable factfinder could find them unworthy of credence." *Grandison v. Ala. State Univ.*, 2022 U.S. Dist. LEXIS 24006, *18 (M.D. Ala. Feb. 10, 2022) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)). Further, a "reason is not pretextual unless it shown that the reason is 'false' and that discrimination or retaliation is the 'real reason.'" *Id.*

Disputing the misconduct underlying the reason to terminate does not establish pretext. In *Grandison*, relying on Eleventh Circuit precedent, the court swatted away plaintiff's dispute of the reasons offered by defendant for termination him, stating:

> For purposes of examining pretext, it can be assumed that Plaintiff is innocent of the charged misconduct. That is because the pretext "inquiry is limited to whether [the] employer believed the employee was guilty of misconduct and if so, whether that was [the] reason behind [the adverse employment action]; that [the] employee did not actually engage in misconduct is irrelevant." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted) (alterations added). In other words, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Id.*

2022 U.S. Dist. LEXIS 24006, at *21. Motes had before him reports of Hudson and Wright having

16

been asleep on their forklifts.  Such conduct undisputedly violates Defendant's safety policies.  Hudson and Wright have not demonstrated Defendant's reason for terminating them is one a reasonable factfinder could find unworthy of credence.  The undisputed evidence regarding Dandridge is even more insufficient to establish pretext. He concedes his underlying misconduct.

The Court concludes Plaintiffs have failed to demonstrate a "convincing mosaic" of circumstantial evidence sufficient to allow a jury to infer intentional discrimination.

      2.      **"Mixed-motive" claims[8]**

Title VII discrimination claims "are typically categorized as either mixed-motive or single-motive claims."  *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  An "adverse employment action motivated by both legal and illegal reasons constitute actionable discrimination under Title VII."  *Quigg*, 814 F.3d at 1236.  Just as single-motive claims, "mixed-motive" claims can be proved with either direct or circumstantial evidence.  *Id.*; *see also Gosa*, 2017 U.S. Dist. LEXIS 14900, at *20.  The parties agree that Plaintiffs' evidence is solely circumstantial.  Mixed-motive claims, based on circumstantial evidence, require the Court to determine whether plaintiffs have "offered 'evidence sufficient to convince a jury that [race] was a motivating factor for defendant's adverse employment action.'"  *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)).

The issue on summary judgment, therefore, is whether Hudson and Wright have offered

---

[8] In a footnote, Defendant states it "does not believe" Plaintiffs' Complaint adequately raises a mixed-motive claim.  The Court disagrees.  The Complaint alleges Plaintiffs' terminations were "motivated by their race," cites Section 2000e-2(m) and *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), and expressly states the Court in *Quigg* addressed "mixed-motive claims under Title VII."  (Doc. 1, para. 84).  The cases cited by Defendant addressed complaints that are materially distinguishable.

evidence sufficient to convince a jury that race was a motivating factor for Motes' termination of them.

On this record, the Court cannot conclude that there are no disputed factual issues and that Defendant is entitled to judgment as a matter of law on Plaintiff Hudson's and Wright's mixed-motive claims. Therefore, Defendant's Motion is denied as to those claims.

### III. CONCLUSION

Defendant's Motion for Summary Judgment as to the claims of Plaintiff Dandridge is GRANTED. Plaintiff Dandridge's claims are dismissed.

Defendant's Motion for Summary Judgment as to Plaintiffs Hudson's and Wright's mixed-motive claims is DENIED.

**DONE and ORDERED** this 30th day of September, 2022.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE