IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN HUDSON, et al,                      )
                                         )
                 Plaintiffs,             )
                                         )
v.                                       )
                                         )   CIVIL ACTION NO. 1:20-00582-JB-C
LOUISIANA-PACIFIC CORPORATION,           )
                                         )
                 Defendant.              )
                                         )

BRIAN WILLIAMS, et al,                   )
                                         )
                 Plaintiffs,             )
                                         )
v.                                       )
                                         )   CIVIL ACTION NO. 1:21-00063-C
LOUISIANA-PACIFIC CORPORATION,           )
                                         )
                 Defendant.              )

**ORDER**

This matter is before the Court on Defendant, Louisiana-Pacific Corporation's Motion for

Summary Judgment as to the claims of Plaintiffs Brain Williams and Kelvin Lewis, and for Partial

Summary Judgment as to the claims of Plaintiff Quentine Westbrook.  (Doc. 50).[1]  The parties

have fully briefed the Motions and filed evidentiary material.  (Docs. 51, 52, 53, 54, 59, 60, 61

---

[1] Plaintiffs' claims were filed as a separate action.  ("*Williams Action*" (1:21-cv-00063-C)).  The *Williams Action* was consolidated with the instant action for pre-trial purposes.  (Doc. 57).  Documents filed in the *Williams Action* prior to consolidation are now in Document 58 of the instant action, which is indexed by the original *Williams Action* document numbers.

and 62).  The Court conducted a hearing on the Motions, at which all parties appeared and argued.  For the reasons set out below, the Court concludes the Motions are due to be GRANTED.

## Jurisdiction and Summary Judgment Standard

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. There is no dispute regarding personal jurisdiction or venue.

The summary judgement standard was well articulated in *James v. SSAB Ala., Inc.*, 2022 U.S. Dist. LEXIS 233693, *17 - 19 (S.D. Ala. Dec. 30, 2022):

> Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

> The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

> Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the

burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 432 Fed. Appx. 867, 2011 WL 2533755, (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." M*atsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal quotation and citation omitted).

## I.     PLAINTIFF WILLIAMS

### A.  Background:

Plaintiff Brian Williams ("Williams") is an African American and former employee of Defendant Louisiana-Pacific Corporation ("LP").  LP hired Williams in January 2019 at its facility in Clarke County, Alabama ("Plant").  Williams worked in the FlameBlock department.  LP manufactures FlameBlock board for use in construction.  During Williams' employment, Jim Motes ("Motes") was LP's Plant Manager, David Belcher ("Belcher") was the FlameBlock Area Manager, and Sundy Phares ("Phares") was Human Resources Generalist.  Austin Green ("Green") was Williams' immediate supervisor.

Williams was initially employed as a Utility II worker.  In June 2019, he cross-trained to be a Line Operator.  (Doc. 51-1, PageID.266).  Williams "worked right next to the line operator, so [he] knew his job." (*Id.*).  Line operators are responsible for ensuring FlameBlock boards are

manufactured at correct weights and with correct material.  By mid-June, 2019, Williams became an acting Line Operator and received a pay increase, after another acting Line Operator, Steven Champion (white), decided to vacate the position.  (PageID.181 and 190, and 51-1, PageID.267 - 269).

LP terminated Williams following events which occurred on August 28, 2019.  Williams, as acting Line Operator, was unable to produce FlameBlock boards at correct weight.  (Doc. 51-1 at PageID.276).  Williams called his supervisor, Green, who instructed him to keep trying.  (*Id.* at PageID.276 - 277).  Williams' continued efforts failed, and he called Green again.  (*Id.*).  Williams told Green he could not perform the job, and did not want to continue producing defective boards.  (*Id.*).[2]  Green then told Williams he had someone who could perform the job, and replaced him.  (*Id.* at PageID.277 - 278).  Williams was informed over 300 FlameBlock boards had been downgraded.  (Williams Dep. 103: 19-22).  Williams approached Green later that night and apologized for his failure to perform his job.  (Doc. 60-5 at PageID.1293 - 1294).  Williams characterizes this meeting with Green as cordial.  He confirms he told Green he could not, and did not want to perform the job.  (Doc. 51-1, PageID.280).

Green told Kelvin Lewis ("Lewis"), Williams' previous supervisor, that Williams said to him over a radio, "F this job, F this, I'm not going to do it.  Get someone else to do it."  (Doc. 60-2 at PageID#1147 - 1148).  William denies he cursed.  Lewis spoke to three employees who were on the floor that night and who had access to radios, each of whom said Williams did not curse.

---

[2] Williams asserts he "tried several corrective techniques" to address his failure to perform the work.  (Doc. 59, at p. 11).  That assertion is not supported by the record testimony that Williams cites.  Williams also offers unsupportive record citations for his assertion that, after he was replaced, he "inquired of Green whether he might be better off transferring to another job in FlameBlock."  (*Id.*).  Williams' cited testimony does not indicate he inquired anything of Green.  Instead, the testimony establishes Green inquired of Williams, and, there is no discussion of whether Williams would "be better off" by being transferred.

4

However, they confirmed Williams told Green he could not perform the job and asked Green to get someone else.  (Doc. 60-2 at PageID.1148 – 1149).  Lewis also spoke with Belcher, the FlameBlock manager, about the incident and his conversation with employees who did not hear Williams curse over the radio.  (*Id.* at PageID.1149).  Lewis recommended to Belcher that Williams be suspended rather than terminated.  Belcher said he would take that into consideration.  (*Id.*).  At some point, Green informed Lewis he was terminating Williams and had approval to do so.  (*Id.* at PageID.1149 - 1150).

On August 29, 2019, Green called Williams to meet in his office.  Lewis was in Green's office during this meeting with Williams.  Green told Williams he was being terminated for having given up on the team, costing the company money, and insubordination. (Doc. 51-1, at PageID.282).  Williams did not respond.  (*Id.* at PageID.283).  Green gave Williams a "Corrective Action Report" ("CAR"), which Williams signed then walked out of Green's office.  (*Id.* at PageID.283 - 284).  The CAR informed Williams he was terminated for the following reasons:  (i) presenting LP with financial risk, (ii) causing unnecessary downtime, (iii) insubordination to Green, (iv) failure to perform job duties as directed by Green, (v) failure to communicate with other employees when asked to operate the line, (v) failure to perform tasks to the best of his ability, (vi) lack of care for the product, and (vii) placing the rest of the team into an upset condition.  (Doc. 51-1 at PageID.306).

Lewis advised Williams to speak with Phares, because he had attended a meeting with her, Motes, and Green, at which Lewis believed Green was railroading Williams, throwing him under the bus, and making him something he was not.  (Doc. 60-5, PageID.1296 - 1297).  Williams did not speak with Phares, but rather sent her an email on September 9, 2019, regarding his

termination and the events of August 28.  (Doc. 51-1, PageID.308).  In his email, Williams denied

he was insubordinate or had refused a command to keep running boards.  (*Id.*).  He disagreed he

had put the team in a bind, because he believed other employees were available to be rotated.

(*Id.*).  Williams attributed his inability to produce proper boards to a lack of training.  (*Id.*).  He

disputes the number of boards he caused to be downgraded.  He does not believe he could have

caused more than 300 boards to be downgraded that night, because he was not running board

long enough to produce that many defective boards.  (*Id.*).  Next, Williams argued to Phares it

was "next to impossible for [him] to have put [LP] in any sort of financial trouble."  (*Id.*).  He noted

he had no previous disciplinary issues and was troubled that his first offense resulted in

termination.  (*Id.*).  Nevertheless, Williams' email confirmed he told Green he could not do the

work.  (*Id.*).  Williams stated he was unsure why Green terminated him, but implied Green was

motivated by nepotism.  Green had family members (particularly a brother-in-law) who were

training for the position.  (*Id.*).  Williams did not mention race as a possible motive.

The next two Utility II employees hired following Williams' termination were black.  (Doc.

51-14).  Also, LP terminated Steven Champion (white) for the same series of events on August 28

for which Williams was terminated.  (Doc. 51-2 at PageID.360 - 361, Doc. 51-5 at PageID.570 -

571).

Williams asserts one cause of action against LP, for race discrimination under 42 U.S.C. §

1981.  (Doc. 30).  LP moves for summary judgment, arguing its decision to terminate Williams

was not based on race but on legitimate, non-discriminatory business reasons.  LP argues

Williams' claim fails as a matter of law because, under the *McDonnell Douglas* burden-shifting

analysis applicable to claims based on circumstantial evidence, Williams cannot establish a *prima*

*facie* case a race discrimination or that its stated reasons for termination were pretextual.  LP
also argues Williams cannot establish a "convincing mosaic" of circumstantial evidence to
support an inference of intentional race discrimination.  Finally, LP contends the record cannot
support an inference that race discrimination was a but-for cause of Williams' termination.

    **B.  Analysis:**

    Section 1981 race discrimination claims are "analyzed in the same manner as claims
brought under Title VII."  *Bolton v. Baldwin Cty. Pub. Sch.*, 47 F. Supp. 3d 1342, 1349 (S.D. Ala.
2014), aff'd, 627 F. App'x 800 (11th Cir. 2015) (citations omitted).  *See also, Lindsey v. Board of
School Com'rs of Mobile Cty.*, 491 Fed. Appx. 8, 9 (11th Cir. 2012) (when a Title VII claim is based
on the same facts as a Section 1981 claim, "the analysis is the same under all theories of liability,
and the claims need not be analyzed separately.").  Under Title VII, it is unlawful for an employer
"to discriminate against any individual with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's race . . .."  42 U.S.C. § 2000e-2(a)(1).  Proof
of discriminatory intent is essential.  "The critical element in establishing wrongful discrimination
in violation of Title VII is discriminatory intent." *James*, 2022 U.S. Dist. LEXIS 233693, *19 (citing
*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).  *See also*, *Gosa v. Wal-Mart Stores E., LP*, 2017
U.S. Dist. LEXIS 14900, *19 (S.D. Ala. 2017) (claims brought under Title VII and Section 1981 both
"require proof of discriminatory intent . . ..")  (citing *Bolton v. Baldwin Cnty. Publ. Schs.*, 47 F.
Supp. 3d 1342, 1349 (S.D. Ala. 2014)).

    A plaintiff may rely on direct, statistical, or circumstantial evidence to prove intentional
discrimination for purposes of a section 1981 claim.  *James*, 2022 U.S. Dist. LEXIS 233693, *20
(citing Walker *v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995)).  Williams offers

only circumstantial evidence.  In cases based on circumstantial evidence, courts apply the familiar burden-shifting framework in *McDonnell-Douglas Corp.  See Chapman v. Al Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000).  "Under *McDonnell-Douglas*, a plaintiff establishes a *prima facie* case of race discrimination by demonstrating that she (1) is a member of a protected class, (2) was qualified for her position; (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or was treated less favorably than a similarly situated employee outside of her class." *Abram v. Von Maur, Inc.*, 719 Fed.Appx. 929, 931 (11th Cir. 2018) (citing *McDonnell-Douglas*, 411 U.S. 792); *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (same).

Williams recognizes he cannot establish a *prima facie* case under *McDonnell-Douglas,* as he cannot point to a similarly situated comparator.  However, Plaintiff correctly argues the *McDonnell-Douglas* framework is not the only method by which to overcome a summary judgment motion in a discrimination case.   A plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  In *Lewis v. City of Union City*, the Eleventh Circuit stated, "a 'plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328).  Williams argues he has presented a "convincing mosaic" of circumstantial evidence of intentional discrimination.

A "'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which

an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185.  "The evidence presented under the 'convincing mosaic' must be sufficient enough 'to overcome the lack of comparator evidence.'" *Williams v. Cleaver-Brooks, Inc.*, 2012 U.S. Dist. LEXIS 174818 (M.D. Ga. Dec. 11, 2012).  Furthermore, a plaintiff proceeding under the "convincing mosaic" framework has the "burden to connect the mosaic tiles; the court need not attempt to piece together a mosaic when she has not done so." *Bradford v. Regions Fin. Corp.*, 2015 U.S. Dist. LEXIS 6005, at *26 (N.D. Ala. Jan. 20, 2015); *see also Killingsworth v. Birmingham-Jefferson Cty. Transit Auth.*, 2019 U.S. Dist. LEXIS 139800, at *29 - 30 (N.D. Ala. Aug. 19, 2019) ("[t]o the extent [the plaintiff] relies on a mosaic of discrimination theory, he must present the tiles and create the mosaic instead of expecting the court to piece it together for him."). Plaintiff's "evidence must lead to the 'unavoidable inference' of intentional discrimination." *James*, 2022 U.S. Dist. LEXIS 233693, *30 (quoting *Smith v. Lockheed—Martin*, 644 F.3d 1321, 1346 (11th Cir. 2011)).  Finally, "even under [the "convincing mosaic] framework, a plaintiff must establish that the employer's justification is pretextual."  *James*, 2022 U.S. Dist. LEXIS 233693, *__ (citing *Lewis*, 934 F.3d at 1185 ("a 'convincing mosaic' may be shown by evidence that demonstrates ... that the employer's justification is pretextual") and *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) ("A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things ... pretext.")).

Williams' evidence of a "convincing mosaic" of intentional discrimination, in addition to the particular facts surrounding his termination, includes what he proffers as four general aspects of the leadership and operation of LP's Plant:

9

(i)  "A Pattern of Unequal Opportunities for Blacks and Whites,"

(ii)  "Signs of Racial Bias among Decision Makers and Supervisors,"

(iii)  "Indifference or Retaliation Regarding Complaints of Discrimination," and

(iv)  "Inconsistent Disciplinary Standards."

(Doc. 59).[3]  The Court reviews Williams' record citations of evidence in support each of these in turn, as a whole and in the light most favorable to him.

Williams cites portions of the record he characterizes as establishing "A Pattern of Unequal Opportunities for Blacks and Whites" at Defendant's Plant.  (Doc. 59 at PageID.1069). He notes black employees are underrepresented in the management of LP's Plant in relation to the overall workforce there, according to Motes and Phares. Motes wanted the Plant management team to be similar to the racial makeup of the Plant floor, which was "about 50/50," but that was "tough to do."  (60-4 at PageID.1251).  According to Lewis, the best paying jobs in the FlameBlock department "tended" to be held by white employees, while the lowest paying jobs were predominately held black employees; white employees were given more of the "upper echelon" jobs.  (Doc. 60-2, at PageID.1215 - 1216).

Lewis, who was responsible for entering pay codes for the employees he supervised, encountered discrepancies in coding for black employees but not for white employees.  (Doc. 60-2 at PageID.1159-1161).  Lewis discussed these discrepancies with Phares, who responded that the pay codes were correct or that Lewis was not coding correctly.  Lewis also testified that

---

[3] The allegations in this and previous sections relating to general racial animus among certain LP leaders are relied upon to some extent by Plaintiffs Westbrook and Lewis as well.  They are assumed and incorporated into the Court's analysis of their claims, *infra*.

when he started, he was told by an employee of LP (he cannot remember who) that he would receive periodic pay scale increases, but he did not.  (Doc. 60-2 at PageID.1112).  He discussed this issue with Phares, and she informed him his position was not eligible for such increases.  (*Id.* at PageID.1113).  He then discussed it with a former supervisor, Bryan Gracie, who said he "couldn't believe it."  (*Id.*).

Westbrook, while working in FlameBlock, experienced irregularities in his paychecks.  He recalls "one period it would be higher [and t]he next pay period lower."  His states his wages had "not been right," and they "just [kept] changing."  (Doc. 60-6 at PageID.1307 - 1311).

Williams further argues that although he and Lewis made "breakthroughs" at the Plant, they were subsequently "stymied."  Williams notes he was terminated about two months after his promotion to acting line operator.  (Doc. 59 at PageID.1071).  As for Lewis, he was made aware by email of the times and dates of scheduled supervisor meetings, but most were at times he was not on shift.  (*Id.* at PageID.1162, 1176, 1178).  Phares responded to his request to change meeting times by informing him he did not need to attend because he worked night shift, and she would "annotate" him.  (*Id.* at PageID.1163).  The meetings addressed major shift changes, as well as administrative, purchasing, and operational training and changes. (*Id.* at PageID.1163 - 1164).  Lewis alleges he was excluded from personnel decisions which resulted in his losing trained line aids.  (*Id.* at PageID.1179 – 1181).  In turn, Lewis received laborers he was instructed to train as line aids.  (*Id.* at PageID.1180).

Some black employees who Lewis supervised told him they had not been provided cross-training or an opportunity to advance prior to his supervision.  (Doc. 60-2 at PageID.1134 – 1136).  Lewis cross-trained both white and black employees, some of whom he believes Green

"cherry picked" from him, most of whom were white.  (*Id.*).[4]

Williams was not trained by the "head operator" before his transition to FlameBlock operator.  (Doc. 60-5 at PageID.1300).  At the same time, Williams confirmed he "worked right next to the line operator, so [he] knew his job" prior to his promotion to acting line operator.  (Doc. 51-1 at PageID.266).   He believes, but does not know, his predecessor, Steven Champion received substantial training from the head operator in accordance with LP's policy.  (Doc. 60-5 at PageID.1300).  Lewis did not receive safety, quality, formal HR, or emergency notification training. (Doc. 60-2 at PageID.1163 – 1174; 1198 - 1204).  He did receive "informal" Kronos training, as well as assistance from Green and Gracie with pay code mistakes he had made.  (*Id.* at PageID.1168 - 1169).  Lewis also received production, slurry, mixing, unloading, water treatment, and baghouse training.  (*Id.* at PageID.1171 – 1175).

Williams next cites portions of the record he characterizes as "Signs of Racial Bias Among Decision Makers and Supervisors" at LP's Plant.  (Doc. 59 at PageID.1072).  He notes Motes described his role as Plant Manager to include "shaping the culture at" LP.  (Doc. 60-4 at PageID.1250).  Motes had the ultimate authority to make hiring and promotion decisions.  (*Id*. at PageID.1254 - 1255).[5]

_____

[4] In Williams' brief, he asserts: "Lewis observed that black employees at the laborer level were typically not cross-trained on the more skilled aide and operator duties, while whites brought into the company in lower skill positions were promptly cross-trained."  (Doc. 59 at PageID.1071).  In support, he cites Lewis' deposition testimony at Doc. 60-2, PageID.1134 – 1136.  That testimony does not support Williams' assertion.

[5] Williams cites this testimony in support of his assertion that Motes "inserted himself as the final decision maker on every single termination . . .."  (Doc. 59 at PageID.1072).  Motes' testimony says nothing here about terminations.

Williams offers the declaration of Ozie Robinson.  (Doc. 60-1).  Robinson is African American who worked with Motes prior to Motes' employment at LP.  Robinson was never employed by LP.  Robinson worked with Motes at Motes' family business from approximately 2003 to 2013, some six or more years prior to Williams' employment at LP, during which time Robinson recalls Motes was openly "racist against black people." Robinson was told that "Motes' family" attended Klan rallies.  Robinson "heard Jim Motes with [his] own ears say 'nigger' so many times [he] cannot give a number. It's too many to count."  He also heard Motes say he did not think black people "were equal to white people," and "[i]f it wasn't  for [affirmative action], there'd be no nigger managers."  Robinson heard Motes tell racist jokes, such as, "How do you starve a nigger to death? You hide his food stamps under his work boots."  He saw Motes, sometime in 2012 or 2013, with a bumper sticker which said, "Don't re-nigger in this election."   Robinson saw Motes at least once (probably more) at LP's Plant.  Sometime between 2017 and 2021, Robinson saw racist graffiti in a bathroom at the Plant ("some form of the N-word") at least once.

Westbrook complained to Phares that LP was "one of the most racist companies" he had ever worked for.  Phares responded that "Motes was fired and things should be better."  (Doc. 60-6 at PageID.1316).

Skyler Chandler (white) testifies Green told him blacks are "demon servants and good for laughs." (Doc. 60-7 at PageID.1324).  Green told Chandler he let black people come to his house and drink on weekends so they can be mocked, laughed at and made fun of "whenever they get too drunk." (*Id*.).  Green addressed black employees as "boy" and "you people." (Doc. 60-6).  Green told Chandler he intended to ensure Lewis was not going to be trained in the hope that he "would mess up on the job and get terminated himself so he could get his friend [for Lewis']

position." (Doc. 60-7 at PageID.1321).

When Lewis and a black employee questioned Phares about a pay discrepancy, she responded, "[y]ou people and this money, you get on my nerves.  I told you I'll take care of it," and, "[w]hy what's up with you people, and it's always about money."  Lewis interpreted this as racially offensive given the context of the conversation.  (Doc. 60-2 at PageID.1152 and 1207-08).  Upon Lewis' termination, he informed Phares he could retrieve his company cell from home and return it.  Phares responded, "I just don't trust you people with that type of thing.  You know, you might not.  You might be upset." (*Id.* at PageID.1191).  Lewis took her phrase "you people" to be a reference to African Americans.  (*Id.* at PageID.1209).

Lewis complained of hazing he believed he was being subjected to by Green, his fellow supervisor and office mate in the FlameBlock division.  It started with "small things" such as items missing from or glued to his desk, trash on his desk, his computer being disconnected, and water in his boots.  (Doc. 60-2 at PageID.1128 – 1131).  The "worst thing" was his discovery of purple Kool-Aid in his hard hat, and things "escalated pretty high."  Lewis found this "very offensive." (*Id.* at PageID.1129).  Lewis complained about these incidents to Phares around September 2019, and she replied she would look into it and report back.  (*Id.* at PageID.1132).  In late 2019 or early 2020, Lewis informed Phares that a white employee told him Green had encouraged him to fabricate a safety allegation against him (Lewis). (*Id.* at PageID.1138 – 1143).  Phares said she would report the matter to "corporate," including Motes, although Motes denied any knowledge. (*Id.* at PageID.1145; Doc. 60-4 at PageID.1248 – 1249).  Phares also instructed Lewis to refrain from spreading propaganda or causing division through the mill.  (Doc. 60-2 at PageID.1145 - 1146).  Lewis complied but does not know what Phares did with his complaints.  (*Id.* at

PageID.1146).   The incidents seemed to have gotten worse for Lewis thereafter.   (*Id.* at PageID.1145).  A few days after Lewis reported the Kool-Aid incident and missing desk items to Phares, she questioned Lewis' team about Lewis' conduct.  Phares said she was investigating an anonymous tip that Lewis had cursed at an employee on this team.  (*Id*. at PageID.1185).

Westbrook also made multiple complaints to Phares regarding discriminatory incidents. (Doc. 60-6 at PageID.1312 - 1313).   Phares told Westbrook that he had caused the incidents. (*Id.* at PageID.1313).  When Westbrook reported mistreatment by his white supervisor, Phares reacted in a threatening manner and suggested his job might be in jeopardy ("you are close to taking it to the gate").   (*Id.* at PageID.1236).  She informed him she trusted supervisors. (*Id*. at PageID.1233).  Phares concedes her tone and words with Westbrook during this conversation was inconsistent with HR standards and could have been construed as threatening.  (*Id.* at PageID.1236 – 1237).

Lewis testified black workers who slept on the job were disciplined more severely, to include termination, than white employees who did so.  (Doc. 60-2 at PageID.1118 – 1123, 1212 – 1214).   Lewis testified a white employee, in one instance, who admitted having fallen asleep and causing a fire to spread was suspended.   (*Id.*).  Lewis claims he was suspended for a safety incident, which turned out to have been fabricated.   Green failed to report several safety violations, including an injury, for which he was not terminated but rather was written-up and given a performance plan as part of progressive discipline.   (Doc. 60-8 at PageID.1327; Doc. 60-3 at PageID.1246; and Doc. 60-2 at PageID.1137 – 1140).   Motes testified that reporting of safety incidents is a part of LP's safety policy, and the failure to report a safety issue should lead to termination.  (Doc. 60-4 at PageID.1256).   Although Lewis was terminated for altering two time

records, he is not aware of any discipline taken against Green following a white employee reporting to Phares that Green had pressured him to lodge a false safety complaint in order to get Lewis fired. (Doc. 62 at PageID.1141 – 1142, 1218 – 1220; Doc. 60-7 at PageID.1322 – 1323).

Lewis reported a white member of his crew for insubordination for calling him a "m*****f*****" and exclaiming, "You're starting to get on my Goddamn nerves."  (Doc. 60-2 at PageID.1153 – 1158, 1205 – 1206).  The white crew member was instructed to apologize to Lewis and was told any other issues would result in termination.  (*Id.* at PageID.1154).

Phares told Westbrook that she trusted supervisors, but told Lewis on a few occasions she could not trust his word without "due diligence."  (*Id.* at PageID.1153).  Lewis stated Williams was terminated for allegedly cursing at Green, but that the employee who cursed at him was not.  (*Id.* at PageID.1157 - 1158).  Phares replied, "there are different measurements for different situations." (*Id.* at PageID.1157).

**C.  No "convincing mosaic" to support inference of discriminatory intent:**

Williams has failed to present a "convincing mosaic" of evidence to support an inference of LP's intentional discriminatory intent.  The Court finds LP's Reply to Williams' argument in this regard (Doc. 61) to be well taken and adopts the analysis therein.  Williams fails to articulate how his evidence bears "suspicious" timing in relation to his termination from which an inference of discriminatory intent might be drawn.   Williams' evidence of LP's racial animus is substantially separated by time from Williams' termination.

Williams' evidence also fails to demonstrate LP *systematically* treated *similarly situated* employees better than black employees.  It is undisputed that LP terminated white and black employees, in addition to Williams, for insubordination.   Other employees mentioned by

Williams reported incidents in which they were involved.  (*Id.*).  Black employees who reported their incidents were not terminated.  (Docs. 42-2 and 42-6).  Williams points to a failure by Green to report an injury, but the injury was to another person and there is no evidence he concealed it, as Williams' comparator had concealed the accident he caused.

Finally, Williams has failed to establish LP's reasons for terminating them were pretextual.  This is significant because "allegedly bias remarks are not sufficient to establish a convincing mosaic absent probative evidence of pretext." *Change v. Midtown Neurology, P.C.*, 2021 U.S. Dist. LEXIS 115666, *60 (N.D. Ga. Feb. 3, 2021) (citing *Melvin v. Fed. Express Corp.*, 814 Fed. Appx. 506, 513 (11th Cir. May 21, 2020)).

To establish pretext, Williams must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" Defendant's reason "that a reasonable factfinder could find them unworthy of credence." *Grandison v. Ala. State Univ.*, 2022 U.S. Dist. LEXIS 24006, *18 (M.D. Ala. Feb. 10, 2022) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)).   A "reason is not pretextual unless it shown that the reason is 'false' and that discrimination [] is the 'real reason.'" *Id.*

Williams cannot establish pretext by merely disputing the misconduct underlying LP's stated reasons for termination.  The law requires more.  In *Grandison*, relying on Eleventh Circuit precedent, the court dispatched plaintiff's denial of defendant's proffered reason for terminating him, stating:

> For purposes of examining pretext, it can be assumed that Plaintiff is innocent of the charged misconduct. That is because the pretext "inquiry is limited to whether [the] employer believed the employee was guilty of misconduct and if so, whether that was [the] reason behind [the adverse employment action]; that [the] employee did not actually engage in misconduct is irrelevant." *Alvarez v. Royal Atl. Devs., Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted) (alterations

added).  In other words, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Id.*

2022 U.S. Dist. LEXIS 24006, at *21.  Similarly, the Eleventh Circuit in *Chapman v. AI Transp.*, 229

F.3d 1012 (11th Cir. 2000) held:

> Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs,* 106 F.3d [1519] at 1541-43 [11th Cir. 1997].  We have recognized previously and we reiterate today that:
>
> > federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."
>
> *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir.2000). We "do not … second-guess the business judgment of employers." *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

Further, LP has proffered more than one legitimate, non-discriminatory reason for Williams' termination.  Williams fails to rebut each reason proffered, and that failure is fatal to his claim.  When more than one such reason is proffered, a plaintiff must rebut all of them.

18

*Crawford c. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).   The Eleventh Circuit in

*Crawford* explained:

> If the employer articulates a legitimate, nondiscriminatory reason for its actions, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 255-56, 101 S. Ct. 1089, 1094-95, 67 L. Ed. 2d 207 (1981). The plaintiff must meet the reason proffered head on and rebut it. Wilson, 376 F.3d at 1088. **If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.** *Chapman v. AI Transp.*, **229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).**

482 F.3d 1305, 1308 (11th Cir. 2007) (emphasis added); *see also, Watson v. City of Prichard*, 2023

U.S. Dist. LEXIS 9950, *39 (S.D. Ala. Jan. 20, 2023) (same).   Williams attempted to rebut only one

of the proffered reasons; namely, he denies he was insubordinate. Williams' undisputed failure

to meet "head on and rebut" each reason given for his termination defeats his claim as a matter

of law and entitles Defendant to summary judgment.

    In addition to Green's informing him "[he] gave up on the team and [] cost the company

money," LP issued Williams a written CAR that listed these reasons and others for his termination.

He does not dispute he failed to do his job, or that he had to be replaced on the line.   (Doc. 59).

Williams does not dispute his failure caused negative financial consequences; he merely quibbles

with the quantity of the loss.

    Williams has not demonstrated LP's reasons for termination were such that a reasonable

factfinder could find them unworthy of credence.   Although Lewis (who was not on shift when

any of these events happened) felt that the proper discipline for Williams was suspension rather

than termination (Doc. 51-2), LP terminated both employees involved that night, including

Williams' coworker, Steven Champion, who is white. (Doc. 51-2, 51-5, and 51-14). Nothing

indicates that this decision was based on race and not LP's stated reasons relating to performance.   Williams' citation to Motes' responding to a hypothetical question (Doc. 59) does nothing to change this.   Finally, the fact that LP replaced Williams with an employee who is also African American indicates that the decision was not based on Williams' race. (Doc. 51-14).

Apart from his failure to demonstrate LP's proffered legitimate reasons were false, he cannot offer evidence that race discrimination was the real reason for his termination.   *See St. Mary's Honor Ctr*., 509 U.S. at 515 (holding that a reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason").   Williams cannot establish but-for causation.   Williams had no interactions with Green or Belcher to suggest that they bore him any animus because of his race.   (Doc. 51-1 at PageID.298 - 299, 302, 304 - 305).   It is undisputed that LP terminated white employees for misconduct, disciplined both black and white employees for single incidents of insubordination, and replaced Williams with Foster, who is also African American.   (Docs. 51-7 and 51-14).   These facts further undermine Williams' argument that LP's real reason for terminating him was race discrimination.

Williams argues there is "ample evidence under the mosaic theory of LP's continually more lenient treatment of performance or disciplinary issues by whites."   (Doc. 59)   The record does not support this argument.   Westbrook (black), for example, was counseled, while Stevie Overton (white) was suspended.   Plaintiff Lewis was coached.   (Docs. 52, 53, and 54).   The white employees LP proffered were disciplined for insubordination or for costly decisions.   They were not disciplined for both reasons or in addition to other reasons.   Moreover, Champion did engage in conduct similar to Williams' and LP terminated him.   Similarly, LP's different treatment of employees who allegedly were asleep at work (Doc. 59), involved employees in different

positions who reported to different supervisors.  (Docs. 51-11 and 51-12).

Williams' undisputed experience with Green and others at LP is at odds with his proffered evidence of a generalized racially discriminatory environment at LP.  Williams has known Green since high school and hung out in his office.  At the time of his termination and at his deposition, Williams believed Green terminated him because of nepotism.  Nepotism "is not actionable under Title VII or Section 1981."  *See Powell v. Am. Remediation & Env't, Inc.*, 618 F. App'x 974, 977 (11th Cir. 2015) (citing *Platner v. Cash & Thomas Contractors*, 908 F.2d 902, 905 (11th Cir. 1990) ("nepotism as such does not constitute discrimination under Title VII.")).

Williams' argument that a convincing mosaic is assembled in part by alleged LP general bias against black employees fails.  He argues Green "harbored virulently racist views" (Doc. 59), based on testimony of a former co-plaintiff that Green said "blacks are demon servants and good for laughs" and that he made fun of black individuals when they come over to his house on the weekends.  (Doc. 59).  Williams also relies on the former co-plaintiff testimony that Green told him he was not going to train Lewis.  However, it is undisputed that Green also told the former co-plaintiff that he wanted to get his friend hired in Lewis' position—not because of Lewis' race.  (Doc. 60-7).  Moreover, Green was not designated to train Lewis but, nevertheless, helped him with his supervisory responsibilities.  (Docs. 51-2 and 54).  Williams' notes Westbrook said Green called black employees "boy" and "you people" to their faces.  However, Williams cannot connect these ambiguous and stray statements to the context of LP's termination of him.  *See Ash v. Tyson Foods, Inc.*, 190 F. App'x 924, 926 (11th Cir. 2006) (even if "boy" were considered to have general racial implications, "ambiguous stray remarks not uttered in the context of the decisions at issue [were] not sufficient circumstantial evidence of bias to provide a reasonable

21

basis for a finding of racial discrimination in the denial of the promotions."), *Boex v.OFS Fitel, LLC,* 339 F. Supp. 2d 1352, 1369 (N.D. Ga. 2004).   The same applies to Phares' stray and ambiguous use of "you people."

Williams relies on Robinson's declaration as evidence of Motes' racial bias.  The Court agrees that the declaration is inadmissible, as it is rife with hearsay. (*See* Doc. 61 at n.11).[6]  Even if it were admissible, it would not satisfy Williams' burden.  Williams did not hear Motes make any racial comments.  Robinson had worked with Motes a decade prior to Motes' employment at LP.  Robinson never worked at LP, with Williams or the other Plaintiffs. (*See* Doc. 60-1).  The declaration states affirmatively that "Motes didn't really have a problem with black people working." (Doc. 60-1).  Williams' conclusory argument that Motes had an "archaic perspective" (Doc. 59 p. 3), is belied by the fact that LP hired and promoted African Americans. (Doc. 60-4, p. 5).  Williams cites *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) but that case is not instructive.  Unlike the facts in *Jenkins*, Motes' alleged comments were not made to LP workers or even while Motes worked at LP.   These "few, attenuated circumstances" do not establish a convincing mosaic.  *See Motton v. Kohler Co.*, 2022 U.S. Dist. LEXIS 69874, *36 (N.D. Ala. April 15, 2022).

## II.     PLAINTIFF WESTBROOK

LP filed for summary judgment as to all of Westbrook's retaliation claims (Count IV of Amended Complaint (Doc. 30), his failure to promote claim related to a position awarded to Henry Coker (Count III of Amended Complaint (Doc. 30), and his § 1981 claim for paycheck

---

[6] LP objected to the admissibility of the Robinson declaration as irrelevant, highly prejudicial, speculative, replete with hearsay, and improper character evidence. (Doc. 61).  The Court finds that the declaration is inadmissible.

discrepancies (*Id.*).  Westbrook has abandoned or failed to otherwise oppose LP's Motion for Summary Judgment on his retaliation claims (Count IV) and his failure to promote claim related to Coker (Count III).  LP's Motion for Summary Judgment is therefore due to be granted as to those claims.

Westbrook's § 1981 claim for paycheck discrepancies is the single claim remaining for resolution on LP's Motion for Summary Judgment.[7]

### A.  Background:

Westbrook was employed at LP's Plant in the FlameBlock department. (Doc. 30).  David Belcher was the FlameBlock Area Manager until he was succeeded by Joe Gage, sometime around November or December of 2019.  Westbrook was hired as a Forklift Operator in April 2018.  In September 2019, he was promoted to entry-level Line Aide.  By June 2020, Westbrook was no longer in the entry-level position, and he remained a Line Aide until his resignation from LP in October 2020.

Westbrook believes Bridges and Green, his supervisors in FlameBlock, had racist intentions and picked on him.  (Doc. 51-3).  Bridges picked on him by requiring that he (and no one else) work while he was on break.  (*Id.*).  On occasion, Westbrook would have to stop one job to do another.  (*Id.*).  Westbrook believes Bridges treated black and white employees in this way (Bristol Johnson (black) and Jonathan Lewis (white)).  (*Id.*). Bridges would take Westbrook off Line Aide duties, then have a white female worker fill in while he was put on other tasks.  (*Id.*).

---

[7] LP did not file a Motion for Summary Judgment as to Westbrook's failure to promote claim relating to a position awarded to Will Vick.  (Count III of Amended Complaint (Doc. 30).  That claim remains pending.

Westbrook testified Green did not cross-train him, which deprived him of an opportunity to advance. (*Id.*). He testified Green and Bridges treated black employees differently but is unable to provide examples. He testified, "it's always something." (*Id.*). Westbrook observed Bridges affording different levels of respect to black and white employees. (*Id.*)

Westbrook told Bridges he treated black employees differently than white employees. (*Id.*). He cannot remember the date he told Bridges this, but believes it was before he was written up for insubordination in December 2019. (*Id.*). Westbrook also told Green about different treatment among black and white employees. (*Id.*). Green would take different employees off one shift and put them on another, which Westbrook understood to be in response to his accusing his supervisors of being racist to other employees. (*Id.*).

Westbrook complained to Phares that he was being discriminated against, treated unfairly, and singled out. (*Id.*). He complained other employees (specifically Jonathan Lewis and Bristol Johnston) were moved around on shifts, that he was not, and that this was unfair. (*Id.*). According to Westbrook, Phares threatened him with termination after he complained about unfair treatment. Westbrook also reported to Phares that a white supervisor was engaged in bullying, but she told him that it was her policy to trust her supervisors. At one point, Phares beat her hand on a table and said Westbrook had done nothing but cause a problem and instigate.[8] Westbrook took her comment as a reference to previous complaints he had made to

---

[8] According to Phares, this episode followed a report to her by a female employee that Westbrook shared a video with other employees, of Westbrook and her (the female employee) engaged in intimate activity. (Doc. 51-4).

her. [9]

Westbrook believes LP gave black employees lower paying jobs than white employees, though he cannot identify any particular white employees in higher paying jobs. (Doc. 51-3). He testified the higher paying positions were Line Operator, Line Aide, and Water Treatment. He identified both white and black employees who filled Line Operator and Line Aide positions. (*Id.*).

LP has a Pay Practices policy. That policy allows employees to report errors in their time records. (Doc. 51-11). Westbrook alleges his paychecks were incorrect on occasion. He testified, "[o]ne pay period, it would be higher. The next pay period lower," and LP never fixed it. (Doc. 51-3).

Westbrook testified he started in the Line Aid position in FB at an hourly rate of around $18, he received pay increases, and his pay was supposed to be $20.57 an hour by the time he resigned. (*Id*.). According to Westbrook's undisputed pay records, his paychecks were incorrect on three occasions. He began receiving $20.57 an hour on the November 3, 2019 pay period, approximately 2 months after starting in FlameBlock. (Doc. 51-11). Westbrook had 21 pay periods after he achieved the $20.57 an hour pay rate in FlameBlock. After the first of those pay periods, there were three pay periods in which he received a lower rate: November 17, 2019 - $20.55 (-.02 per hour); February 23, 2020 - $19.71 (-.86 per hour); and May 31, 2020 - $20.01 (-.56 per hour). The November 2019 mistake totaled $1.32 and $1.46 in overtime. The

---

[9] Westbrook contacted the EEOC to file a complaint but he never completed that process. (Doc. 51-3).

second mistake three months later, in February 2020, totaled $85.89 including overtime.   The

final mistake, three months later in May 2020, totaled $73.92 including overtime.  Westbrook

sustained a total of $162.59 in pay discrepancies.

Westbrook alleges LP paid him incorrectly because of his race. (Westbrook Dep. 109:9-

110:15). He does not know of anyone else who had similar paycheck issues. (Westbrook Dep.

51:1-9). He believes his pay issues were related to his race because of LP's unequal treatment

of black and white employees.  (Doc. 51-3). However, he testified LP's unequal treatment did

not relate to its handling of paychecks, but rather to white and black employees generally.

(*Id.*).  Westbrook testified:

> Q.    So what Caucasian people were treated differently than you
> with regard to their paycheck?
>
> A.     It's not concerning the paycheck.  It's just them treating
> Caucasians differently in general.

(*Id.* at PageID.470).

Lewis testified he knew of a number of black employees who had problems with

paychecks. (Doc. 51-2).  Lewis testified, as a supervisor, he had to intercede as a supervisor

regularly on behalf of black employees who found discrepancies in their pay.  He recalls Phares

at one point said in frustration, "Why, what's up with you people, and it's always about money."

Lewis took her comment as implying multiple black employees had expressed concerns about

their pay.

Phares testified that when an employee had an issue with improper pay, the employee

was to go to their supervisor first, and then to her if necessary. Westbrook went to Phares about

three times with paycheck concerns.  She told him it was a mistake, they were short-staffed, and it would be fixed. (Doc. 51-3). Westbrook alleges the mistakes were not corrected. (*Id.*).

Green testified that Kronos (LP's timekeeping system) would malfunction on occasion and employees would be paid incorrectly. (Doc. 51-5). Green would email Phares the issue and a pay adjustment in Kronos would be made, or Phares would correct it on a subsequent check. (*Id.*). Both black and white employees talked to Green about pay issues, including Jamarus Norwood (black), Kyle Autry (black), Brent Newton (white), and Mitch Overstreet (white). (*Id.*). Each time, Green went with the employee to see Phares and she said she would fix it. (*Id.*). Green never had anyone return to indicate whether the pay issue was fixed or not. (*Id.*).

Motes knew about employee complaints regarding pay issues, but received no complaints that the pay issues were related to race. (Doc. 51-7). Motes indicated pay issues were a regular problem for all employees.  (*Id.*). On one occasion, many employees were paid incorrectly and LP issued checks. (*Id.*). Anthony Dandridge (black) received a letter with a check for missing pay, after he left employment with LP.  (*Id.*).

B.  **Analysis:**

LP argues it is entitled to summary judgment on Westbrook's pay discrimination claim because he cannot prove an adverse employment action.  LP also contends Westbrook cannot prove LP treated employees outside his protected class more favorably.

To establish an "adverse employment action," Westbrook must produce substantial evidence that the pay discrepancies he suffered constituted a "serious and material change in the terms, conditions, or privileges" of his employment. *See*, *James v. SSAB Ala., Inc.*, 2022 U.S. Dist. LEXIS 233693, *23 (S.D. Ala. Dec. 30, 2022), and *Davis v. Town of Lake Park*, 245F.3d 1232,

1239 (11th Cir. 2001), overruled on other grounds, *Burlington Northern v. White*, 548 U.S. 53 (2006). It is undisputed that Westbrook's pay discrepancies total $162.59.

Westbrook does not know of any other employee who experienced paycheck issues like his. Although Lewis' experiences with pay issues was limited to black employees, Green worked with both black and white employees who experience pay deficiencies. He discussed these issues with Phares, and none of the employees followed up about it. According to Motes, there were "a ton" of employees who were not paid correctly, LP issued checks, and at least one of the checks went to a former African American employee. It is undisputed evidence that paycheck discrepancies were a common occurrence, and the record does not support an inference that Westbrook's discrepancies were related to his race.

Additionally, Westbrook's cannot demonstrate an adverse employment action because only three of 29 paychecks he received while serving in the FlameBlock department were incorrect, and amounted to a total potential disparity of $162.59. Westbrook cites *Gillis v. Georgia Department of Corrections*, 400 F.3d 883 (11th Cir. 2005), and argues there is not, as a matter of law, a "de minimis" standard applicable to his claims. (Doc. 59). However, as LP notes, the Eleventh Circuit has held that suspension resulting in the loss of $88.73 did not constitute an "adverse employment action." *Embry v. Callahan Eye Foundation Hospital*, 147 F.App'x 819, 829 (11th Cir. 2005). Importantly, the Court in *Embry* clarified that *Gillis* involved an employment decision that "significantly affected the plaintiff's compensation," not a "*de minimis* raise." 147 F.App'x 819, 829 (11th Cir. 2005). The amount at issue in *Embry*, as the amount at issue here, "did not constitute 'a serious and material change in the terms,

conditions, or privileges of employment.'" *Id.*  As such, Westbrook cannot prove an adverse employment action.

Westbrook's undisputed testimony establishes his failure to identify a white comparator that LP treated more favorably in terms of paycheck management.  It is undisputed both white and black employees experienced paycheck discrepancies.

### III.    PLAINTIFF LEWIS

A. <u>Background</u>:

Lewis was employed in LP's FlameBlock department.  During his employment, Motes was the Plant Manager.  David Belcher was the FlameBlock Area Manager until his resignation in December 2019.  He was succeeded by Joe Gage.  Phares was LP's Human Resources Generalist.

Lewis was terminated on February 21, 2020 for falsifying time records.  It is undisputed Lewis did so.  Nevertheless, Lewis alleges LP terminated him based on race and in retaliation for complaints he made about discrimination.  LP argues it is entitled to summary judgment because its decisions with respect to Lewis were legitimate business decisions which had nothing to do with race, and were unrelated to any protected activity.

Lewis was first employed with LP as a "Shipping Lead" at $18.86 per hour.  His duties included assisting supervisors and performing supervisory tasks. Some three and a half months after becoming employed, Lewis received an informal discussion regarding poor performance and attendance, which Lewis disputed.

Belcher, the FlameBlock Area Manager, approached Lewis during his service as a Shipping Lead and encouraged him to apply for a supervisor position in the FlameBlock department.  Lewis applied, and interviewed with Belcher, Motes, and Plant Superintendent

Drew Scott.  They unanimously selected Lewis for the supervisor position.  Austin Green was another FlameBlock supervisor, who had been in that position for some time prior to Lewis.

Supervisors in Lewis' position received training in a number of areas, including Kronos timekeeping and safety.  Lewis received most of this training.  Though he states he did not receive safety training from LP's Safety Manager, Lewis had been trained in "Life Saving Rules" and "Lockout/Tagout" procedures upon his initial employment in 2018 and again in 2019.  He does not recall receiving administrative or quality training.  Lewis recalls seeing a white employee being trained and tried to join in, but was directed to return to his personnel and told that training would be rescheduled for him.

As a supervisor, Lewis was responsible for verifying and signing off on employees' time in Kronos.  Phares audited Kronos sign offs.  Much of Lewis' training in Kronos was informal.  Green received no formal Kronos training.  Lewis would consult Green if he made a mistake.  Green in turn would help Lewis correct the mistake or correct it himself.  Lewis assumed Green corrected his mistakes.

The FlameBlock department conducted team meetings two or three times each month.  Facts relating to Lewis and the team meetings are set out in more detail in Section I.B., *supra*.  Lewis received meeting schedules.  Most meetings were set for morning shift hours, which Lewis missed when he was on night shifts.  Lewis once requested that a meeting be moved so that he could arrange to attend, but Phares told him not to worry about it and that she would advise him of what transpired.  Although supervisors were encouraged to attend team meetings, they usually did not.  Supervisors were not excluded.  Attendance of team meetings was not a key responsibility of supervisors.

Lewis testifies generally that major personnel shifts would occur after team meetings, although he can remember only one example in November 2019.  At that time, three line aides were moved from Lewis's shift.  Lewis also alleges Green was able to obtain superior employees in the course of shift changes, including taking two employees that Lewis had cross-trained (one white and one black).  It is undisputed that Green had seniority in terms of time of employment.

In August 2019, Lewis was accused of a safety violation by a white employee, Skyland Chandler.  Lewis had previously observed Chandler failing to sufficiently contribute to the work effort and confronted him about it.  Chandler was upset, and he and Lewis began to work on separate shifts.  After starting his new shift, Chandler reported to Green that Lewis had caused a safety violation by directing him to work in a machine without proper safety precautions.  Chandler provided a written statement, complained Lewis had threatened his employment, and discussed the matter with Phares.

Lewis met with Phares about the incident and provided her with his side of the story.  Phares advised Lewis the matter was grounds for termination, but asked him to provide a statement and sent him home pending an investigation.  Although Lewis took this as a "suspension," Phares put him on administrative leave and he continued to receive his salary.  Lewis believes both he and Chandler should have been sent home.

The scope of the investigation included the subject safety incident, as well as Lewis' behavior toward his personnel generally.  Phares gathered statements from black and white employees, who corroborated Lewis' cursing and singling out his employees.   Lewis was then interviewed by a LP panel which determined that Chandler as well as Lewis were at fault for the underlying safety incident.  Lewis' training was supplemented to include additional new

hire and safety material.  Belcher, the FlameBlock Area Manager, met with Lewis to coach him.
Lewis was not suspended or otherwise disciplined.

Upon Lewis' returning to work after the investigation, a white employee, Brent Newton,
cursed him in the presence of another employee.  The matter was presented to Phares and
Newton apologized to Lewis.  Lewis noted Plaintiff Williams was terminated for cursing at Green,
though he does not appear to have noted the additional reasons for Williams' termination.

Phares told Westbrook that she trusted supervisors but told Lewis on a few occasions
she could not trust his word without "due diligence."  (*Id.* at PageID.1153).  Lewis stated Williams
was terminated for allegedly cursing at Green, but that the employee who cursed at him was
not. (*Id.* at PageID.1157 - 1158).  Phares replied, "there are different measurements for different
situations." (*Id.* at PageID.1157).

Lewis met with Phares in September 2019 to complain about the matters set out in detail
in Section I.B., *supra*.  Phares' responses to his complaints are also set out in Section I.B.

Gage, soon after becoming FlameBlock Area Manager in late 2019, asked Lewis if he
would take Chandler onto his shift.  Lewis agreed.  Thereafter, Chandler claimed that his prior
report of a safety violation was false, and that Green had encouraged him to make the report.
Lewis reported Chandler's claim to Phares at the end of 2019 or January of 2020.  Lewis
perceived that Phares began micromanaging him after he reported Chandler's claim.  Phares
began daily visits to, and demonstrated an increased interest in, Lewis' department, and got
"heavy-handed."

In the course of conducting Kronos audits, Phares discovered of pattern of Lewis'
personnel arriving late to work.  She noted schedule changes were made which accommodated

the tardy arrivals.   Phares discovered Lewis had made a number of adjustments to time schedules, which allowed unearned paid time off and concealed late arrivals.   Kronos adjustments of the sort made by Lewis violated LP policy.   Lewis does not dispute he made the adjustments.  He believes the adjustments did not cost LP.

LP terminated Lewis on February 21, 2020 for altering and falsifying time records.  A termination meeting was conducted with Lewis, at which Phares told him she did not trust "you people."   Phares used that phrase in relation to Lewis' offer to retrieve a company cell phone from his home and return it.  Phares said, "You know what, I just don't trust you people with that type of thing.  You know, you might not.  You might be upset."  Lewis admitted during the meeting that he changed work schedules and timecards.   Lewis' advised that his prior supervisor, Brian Gracie (black), and Green previously adjusted Kronos records.  He advised that he had not been properly trained on Kronos.

LP terminated both black and white employees for adjusting Kronos time records.  (Docs. 51-7 at PageID.632 - 633, and 51-8 at PageID.657 – 660).

It is undisputed that Motes was unaware of Lewis' complaints to Phares.

**B.  <u>Analysis</u>:**

Lewis alleges both termination and retaliation in violation of Section 1981.  LP moves for summary judgment on grounds that there is no genuine issue of material fact that race was a but-for cause of his termination or alleged retaliation.  Further, LP contends Lewis has failed to produce sufficient evidence to raise a reasonable inference of intentional discrimination.

### 1. Suspension

LP first argues Lewis cannot establish a *prima facie* claim relating to his "suspension" pending the investigation of his reported safety violation.  The "suspension," as LP notes, was an administrative leave during which Lewis suffered no reduction in pay.  Lewis' paid "suspension" did not constitute an adverse employment action.  *See Davis v. Legal Servs. Alabama, Inc.*, 19 E.4th 1261 (11th Cir. 2021).  In the absence of an adverse employment action, Lewis cannot establish a *prima facie* claim in relation to his "suspension."

### 2. Termination

As for Lewis' termination, LP argues he cannot establish its proffered reason is pretextual.  LP terminated Lewis for falsifying time records of his personnel.  Therefore, Lewis must demonstrate that LP used his adjustments of time records as a pretext to unlawfully discriminate against him.  As noted above, to establish pretext, Lewis must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in LP's proffered reason "that a reasonable factfinder could find [it] unworthy of credence."  *Grandison v. Ala. State Univ.*, 2022 U.S. Dist. LEXIS 24006, *18 (M.D. Ala. Feb. 10, 2022) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)).  Moreover, Lewis cannot establish LP's reason as pretextual unless he demonstrates it is "'false' and that discrimination [was] the 'real reason' for his termination." *Id.*

Lewis admits LP's reason that he adjusted time records.  It is undisputed that LP policy prohibits adjustments.  Lewis responds that actual practice allowed for such adjustments, but it is undisputed that LP terminated black and white employees for related violations.  Lewis

contends that the details of the adjustments that led to those terminations differed from his, but such differences are immaterial to the policy which all of them violated.

Lewis fairs no better under a "convincing mosaic" analysis. Again, a "'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185. On this record, taken as a whole and viewed in the light most favorable to Lewis, he cannot create any genuine issue of fact that would allow an inference of discriminatory intent. First, the notion of "suspicious timing" of Lewis' termination is belied by the record. In fact, the close temporal proximity of his termination to LP's discovery of his time record adjustments undermines the argument. *See Wills v. Walmart Assocs.*, 592 F. Supp. 3d 1203, 1249 (S.D. Fla. 2022) (citing *Hayes v. ATL Hawks, LLC*, 844 F. App'x 171, 180 (11th Cir. 2021) (finding no suspicious timing because, "while [the plaintiff's] termination may have been in close proximity to his complaints about [disparate treatment], it was also in close proximity to" acts of misconduct that were the "incidents for which the ATL Hawks assert he was terminated"); and *Key v. Cent. Ga. Kidney Specialists PC*, 2021 U.S. App. LEXIS 33949 (11th Cir. Nov. 16, 2021) ("[w]hen viewed in the light of the record as a whole—including Plaintiff's unprofessional conduct on the days immediately preceding Plaintiff's firing—Plaintiff's evidence of 'suspicious' timing is insufficient" to create a convincing mosaic)). Further, LP's discovery of Lewis' adjustments intervened between his complaints of discrimination to Phares and his termination for the adjustments. *See Berry v.*

*Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) ("intervening discovery of employee misconduct can sever the causal inference by close proximity.").

Neither does the record support an argument that LP afforded "systematically better treatment" of employees "similarly situated" to Lewis.  Indeed it is undisputed LP terminated other employees (both white and black) for similar misconduct.  Therefore, Lewis' argument that LP treated white employees differently is unsupported by the record.  Certainly, Lewis has failed to offer any "similarly situated" white comparator treated differently for purposes of *McDonnel Douglas*, or that LP afforded "systematically" better treatment of similarly situated white employees.  Lewis points to no violation of the policy known to LP management that when undisciplined.  He argues there are dissimilarities between him and his admitted offense and those of the other terminations noted by LP.  He argues the other terminations "might" have changed records to conceal time not later offset working late.  However, Lewis offers nothing in the record by which a jury might make such an inference.  Furthermore, the record does not indicate a violation of adjustment to records may be cured by later work.  To the contrary, schedule adjustments were dependent on a supervisor contacting LP Human Resources.  (Doc. 54 at PageID.1045).  Finally, Lewis' complaint that the circumstances of the other terminations are not even more detailed in the record prejudices his case, as it is Lewis' burden to produce sufficient evidence of disparate treatment by which a jury may infer discriminatory intent.

Finally, Lewis has failed to create any genuine issue of material fact that LP's stated reason was pretextual.   As noted, LP's reason is not infected by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," that a reasonable factfinder could find it "unworthy of credence."

### 3. Retaliation

LP argues it is entitled to summary judgment on Lewis' retaliation claim because he has not demonstrated a genuine issue of material fact of causation between his termination and his complaints of discrimination.  LP also argues, again, Lewis' failure to demonstrate pretext.  Taking the last first, the Court agrees that Lewis' failure to establish pretext undermines his retaliation claim, even if approached under the convincing mosaic framework.  *Crestwood Healthcare LP*, 84 F.4th at 1311 (han employee may prove retaliation under the "convincing mosaic framework," which is a "metaphor" for the legal standard of circumstantial evidence necessary for a reasonable factfinder to find retaliation), *see also Reyes v. Fed. Express Corp.*, 2022 U.S. App. LEXIS 24437, *13 – 14 ("to show that a proffered reason is pretext for retaliation," an employee must "show[] both that the reason was false, and that retaliation was the real reason.").

Additionally, an inference of retaliation is weakened by the Court's analysis above, of the timing of Lewis' complaints, his termination, and LP's treatment of similarly situated employees.

## CONCLUSION

For the reasons stated herein, LP's Motion for Summary Judgment (Doc. 50) is GRANTED.

DONE and ORDERED this 19th day of December, 2023.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE